UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

JENNIFER WEITLAUF,

         Plaintiff,

     v.

GREGORY L. HOPKINS, *et al.*,

         Defendants.

───────────────────────────────

21-CV-1052-LJV
DECISION & ORDER

On September 27, 2021, the plaintiff, Jennifer Weitlauf, commenced this putative class action under the Fair Debt Collection Practices Act ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and New York State law. Docket Item 1. She alleges that the defendants, a group of individuals and business entities, are part of an enterprise that illegally collects debt. Docket Item 18. After some defendants moved to dismiss the action, Docket Item 9, Weitlauf amended her complaint, Docket Item 18. On March 30, 2022, those same defendants moved to dismiss the amended complaint, Docket Item 23; on April 13, 2022, Weitlauf responded to the motion to dismiss, Docket Item 24; and on April 20, 2022, the moving defendants replied, Docket Item 25.

For the following reasons, the defendants' second motion to dismiss is granted in part and denied in part, and what remains of the claims against the moving defendants will be dismissed if Weitlauf does not amend her complaint within 30 days.

## BACKGROUND[1]

Weitlauf alleges that the defendants in this case are part of an "illegal collections enterprise," Docket Item 18 at ¶ 11 (1),[2] operating within the "vast and seedy underbelly of the American debt collection industry," *id.* at ¶ 2 (1), which largely is concentrated in the Buffalo-Rochester metropolitan area, *id.* at ¶ 7 (1).  Unlike law-abiding debt collectors who "make significant efforts to comply" with the FDCPA, *id.* at ¶ 1, illicit debt collectors operate pseudonymously and thus can "engage in the worst sort of debt collection abuses safe in the knowledge that their anonymity renders them nearly invulnerable," *id.* at ¶ 2 (1).  They "commonly employ collection tactics" that are intended to "harass and shame [debtors] into payment," including contacting debtors' friends and family, falsely threatening to serve debtors with "papers" at their workplaces, and falsely threatening to repossess debtors' property or garnish their wages.  *Id.* at ¶ 3 (1).

Pseudonymous debt collectors target "debts for which the likelihood of repayment is extremely low," such as "payday loans that have already been worked by other collectors[ and] out-of-statute debts."  *Id.* at ¶ 4 (1).  Because they "do not report debts to credit reporting agencies or file collection lawsuits," these collectors are not concerned with proving that the debts they pursue are still owed, let alone that they

---

[1] On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  The following facts are taken from the amended complaint, Docket Item 18, and are viewed in the light most favorable to Weitlauf.

[2] The amended complaint includes two sets of paragraphs numbered 2-14. References to the first set of paragraphs are denoted by a "(1)" after the paragraph number.

have a legal right to collect those debts.  *Id*. at ¶ 5 (1).  In fact, they often do not have a legal right to the money they pursue because they often source their "targets" from spreadsheets known as "bad paper."  *Id.* at ¶ 6 (1).  Those spreadsheets contain "the personal information of purported debtors" and are "sold off after the debts they record have been paid" or are "stolen by [] employee[s] of one debt collector and fenced to another."  *Id*.

## I.    THE DEFENDANTS

The players in the pseudonymous debt collection industry are "deeply interconnected"; they move "among an ever-changing stable of business entities that are created and discarded . . . in order to evade liability."  *Id*. at ¶ 8 (1).  The individual defendants in this case are three such players: Gregory L. Hopkins, Roy J. Richards, and Bradley C. Williams (collectively, the "individual defendants").  *Id*. at ¶ 9 (1).  "All three are repeat 'customers' of FDCPA attorneys."  *Id*.

Hopkins "has been active on the Buffalo-Rochester . . . debt collection scene since at least 2015, when he and his first known company"—defendant GPG Processing, LLC ("GPG"), then called Revenue Management Group, LLC—were "sued for violating the FDCPA" by threatening to pursue criminal charges against a debtor and to serve him at his workplace.  *Id*. at ¶¶ 29-30.  Since then, GPG "has been sued at least eleven additional times for substantially similar alleged violations."  *Id*. at ¶ 31.  In 2016, Hopkins's half-brother—Travell Thomas, who is not a party to this action— "ple[aded] guilty to [c]onspiracy to [c]ommit [w]ire [f]raud and [w]ire [f]raud . . . for operating an illegal debt collection scheme."  *Id*. at ¶ 5.

Richards "has been active on the Buffalo-Rochester . . . debt collection scene since at least 2018, when he began operating [d]efendant Source Solutions Management, LLC ('SSM')[,] as its managing member."  *Id.* at ¶ 33.  "SSM has been sued for violations of the FDCPA at least eleven times, including at least two instances in which it and GPG were sued jointly."  *Id.* at ¶ 35.  "The allegations in th[o]se cases included the use of false and misleading names . . . , attempts to collect debts not owed and out-of-statute debts, threats of legal action that SSM could not and did not intend to take, and even threats of arrest."  *Id.*

Williams "was active on the Buffalo-Rochester . . . debt collection scene from at least 2018, when he registered [d]efendant 4CIS, Inc. [('4CIS')], until at least mid-2019," when he relocated to the area near Charlotte, North Carolina, and Rock Hill, South Carolina, another "hotbed of pseudonymous debt collection."  *Id.* at ¶¶ 37, 39.  "4CIS has been sued once for violations of the FDCPA."  *Id.* at ¶ 38.  The complaint in that case alleged that 4CIS used a false and misleading name; claimed to be a mediation company; and falsely threatened to sue the debtor, seize the debtor's assets, and serve the debtor at his workplace.  *Id.*

"Williams has continued to cooperate with Hopkins and Richards" since relocating.  *Id.* at ¶ 39.  "For example, more than a year [after he relocated,] Williams remained listed as the point of contact with a payment processor for a company whose website was registered by Richards."  *Id.*  In 2021, Williams "ple[aded] guilty to one count of [f]inancial [i]nstitution [f]raud" for creating and depositing 173 fraudulent checks and "attempt[ing] to distribute" funds from those checks "to himself, Hopkins, and [defendant] RJR Org. LLC" ("RJRO").  *Id.* at ¶ 7.

4

"The business filings, Paycheck Protection Program applications, criminal prosecutions, and civil forfeiture actions involving [Hopkins, Richards, Williams,] and their relatives reveal that [the individual defendants] have registered at least eight separate business entities to use as vehicles for their pseudonymous collection activities."  *Id.* at ¶ 10 (1).  These entities—several of which are defendants in this case—include two holding companies (the "holding company defendants"), at least seven collection entities (the "collection entity defendants"), and one "football training camp."  *Id.* at ¶¶ 8-18.

The two holding company defendants are G.L. Hopkins Enterprises, LLC ("GLHE"), and RJRO.  *Id.* at ¶¶ 8-9.  Weitlauf alleges that Hopkins is the "sole member and sole employee" of GLHE; that Richards is the "sole member and sole employee" of RJRO; that Hopkins and Richards "freely and continuously comingle[]" their personal funds with their respective companies' funds; and that both Hopkins and Richards "disregard[] corporate formalities."  *Id.*

The seven named collection entity defendants are GPG; SSM; Standard Management Associates, LLC ("SMA"); Quality Resolution Services LLC ("QRS"); 4CIS; Asset Retention Group, LLC ("ARG"); and Premier Asset Management Group, Inc. ("PAMG").  *Id.* at ¶¶ 10-16.  Each collection entity defendant "holds itself out as a third-party debt collector."[3]  *Id.*  "GPG lists [] Hopkins as its owner and GLHE as its manager in public filings."  *Id.* at ¶ 10.  "SSM lists Hopkins, Richards, GLHE, and RJRO as its

---

[3] The amended complaint alleges that QRS "holds itself out as a debt collector" rather than a "third-party debt collector," Docket Item 18 at ¶ 13, but based on that allegation's inclusion among allegations about six other "third-party debt collector[s]," *see id.* at ¶¶ 10-16, this Court assumes that Weitlauf meant to allege the same about QRS.

officers in public filings." *Id.* at ¶ 11.  SMA and 4CIS were registered by Williams.  *Id.* at ¶¶ 12, 14.

The amended complaint names one other business entity as a defendant: Changing the Community, Inc. ("CTC").  *Id.* at ¶ 18.  CTC, which is owned and managed by Hopkins, "holds itself out . . . as a football training camp for the benefit of the community."  *Id.*  But Weitlauf alleges that Hopkins "uses funds acquired via his illegal debt collection activities to fund the activities of CTC and then draws a 'clean' salary through CTC."  *Id.*

Finally, the amended complaint names "John Doe Corporation #s 1-10 ("Doe Corps") as a placeholder for "other, presently unknown business entities" owned, managed, or operated by the individual defendants.  *Id.* at ¶ 17.

## II.    CONNECTIONS BETWEEN AND AMONG THE DEFENDANTS

The amended complaint identifies numerous connections between and among the defendants.  *Id.* at ¶ 10 (1).  According to Weitlauf, those links lead "to the inescapable conclusion that the [] [d]efendants' business interests are deeply interconnected."  *Id.*

First, Weitlauf alleges that Hopkins, Richards, GLHE, and RJRO are officers of SSM.  *Id.* at ¶ 11.

Second, Weitlauf identifies several addresses allegedly shared by various defendants:

- 135 Holyoke Street, Apt. 2B, Rochester, NY 14615 ("135 Holyoke"), is Hopkins's home address, *id.* at ¶ 5; GLHE's listed address for service, *id.*

at ¶ 8; and the address that PAMG listed on its Paycheck Protection Program application, *id.* at ¶ 16.

- 3465 Genesee Street, Cheektowaga, NY 14225 ("3465 Genesee"), is GLHE's listed address in public filings.  *Id.* at ¶ 8.  Weitlauf alleges, "[o]n information and belief, [that] all of [the d]efendants' employees work from an office at" that address.  *Id.* at ¶ 41.

- 40 Humboldt Street, Rochester, NY 14609 ("40 Humboldt"), is the listed address for service for RJRO, *id.* at ¶ 9; GPG, *id.* at ¶ 10; SSM, *id.* at ¶ 11; QRS, *id.* at ¶ 13; 4CIS, *id.* at ¶ 14; ARG, *id.* at ¶ 15; and PAMG, *id.* at ¶ 16.

- P.O. Box 246, Buffalo, NY 14225 ("P.O. Box 246"), is a publicly listed contract address for both GPG and SSM.  *Id.* at ¶¶ 10-11.

- 620 Park Avenue, #159, Rochester, NY 14607 ("620 Park"), is a "private UPS mailbox" used by SSM, SMA, QRS, and 4CIS.  *Id.* at ¶¶ 11-14.  It is also the address that SMA used on its Paycheck Protection Program application.  *Id.* at ¶ 12.

- P.O. Box 21326, Philadelphia, PA 19141 ("P.O. Box 21326"), is an address used by ARG, *id.* at ¶ 15, and listed on PAMG's website, *id.* at ¶ 16.

Third, Weitlauf alleges that SSM and QRS have shared a workers' compensation insurance plan.  *Id.* at ¶¶ 11, 13.

Finally, Weitlauf alleges that in 2021, Williams pleaded guilty to one count of financial institution fraud related to a scheme in which he attempted to distribute illicitly obtained funds to himself, Hopkins, and RJRO.  *Id.* at ¶ 7.

### III.  THE ENTERPRISE

Weitlauf alleges that Hopkins, Richards, and Williams are each an "owner, officer, member, or manager" of GPG, SSM, PAMG, SMA, QRS, 4CIS, ARG, and Doe Corps.[4]  *Id.* at ¶¶ 19-27.  But, Weitlauf says, those business entity defendants are "but convenient fictions" that enable the individual defendants to run a "unified illegal collections enterprise."  *Id.* at ¶ 11 (1).  Weitlauf advances two alternative theories for how this collections enterprise is structured.

First, she alleges that the individual defendants "operate . . . a unified business consisting of an undifferentiated mass of debt collector employees."  *Id.* at ¶ 40.  Within that business, the individual defendants "directly and indirectly control[] the collections process at each" collection entity defendant "by selecting and/or designing call scripts, overseeing the hiring and training of workers," and directing FDCPA compliance.  *Id.* at ¶¶ 21, 24, 27.  The defendants share a cadre of employees who collect debt on behalf of multiple collection entity defendants, "and deposits of payments received from consumers are distributed between accounts belonging to different" collection entity

---

[4] Weitlauf makes some allegations "[o]n information and belief" and others "[o]n reference and belief," apparently depending on whether she has documentation in support of what she says.  For example, she alleges "[o]n reference and belief" that Hopkins is an owner, officer, member, or manager of GPG because "GPG lists [] Hopkins as its owner . . . in public filings."  Docket Item 18 at ¶¶ 10, 19.  But she alleges "[o]n information and belief" that Hopkins is an owner, officer, member, or manager of QRS because she does not have a paper trail connecting the two.  *See id.* at ¶ 20.

defendants.  *Id.* at ¶ 42.  "[E]mployees are often paid from accounts belonging to different business entities in different months."  *Id.* at ¶ 43.

Alternatively, Weitlauf alleges that the individual defendants operate the collection entity defendants "in sequence, generally having only [a few] . . . active . . . at a given time."  *Id.* at ¶ 44.  In that scenario, the collection entity defendants "have distinct pools of employees in up to three locations," *id.*, and "regularly transfer employees between and among . . . locations" or "have employees of one entity make calls on debts nominally belonging to another entity," *id.* at ¶ 45.  Additionally, the defendants "regularly transfer spreadsheets of debtor information between and among collection entities."  *Id.* at ¶ 46.

Regardless of the enterprise's exact structure, the defendants "share tips and techniques for threatening purported debtors into paying debts they do not owe without quite being bad enough to draw a federal prosecution."  *Id.* at ¶ 48.  For example, "the scripts used by all employees of all [c]ollection [e]ntity [d]efendants were provided by Hopkins to Richards and Williams."  *Id.*

What is more, the defendants obtain much or all of the information about the debts they pursue "from disaffected employees of other debt collectors who are double selling paper, by purchase of out-of-statute debt from legitimate debt collectors, and by transfer between and among themselves."  *Id.* at ¶¶ 49-50.  The defendants "do not maintain contracts or a relationship with the sellers" of this debt and thus have no way to prove that they have a legal right to collect the debt.  *Id.* at ¶ 50.  So "absent [the

defendants'] misrepresentations and threats," Weitlauf says, "no reasonable person would pay [them] a penny."[5]  *Id.* at ¶ 51.

## IV.   WEITLAUF'S LOAN

In 2014, Weitlauf "took out" a payday loan[6] from a company called Check N' Go. *Id.* at ¶¶ 52-53.  After Weitlauf defaulted, Check N' Go sold the debt to JTM Capital Management, LLC ("JTM").  *Id.* at ¶ 55.  JTM buys "defaulted consumer debts [and] regularly outsources collection . . . to third-party debt collectors."  *Id.* at ¶ 56.  In 2019, JTM either sold or "outsourced collection" of Weitlauf's debt.  *Id.* at ¶ 57.  The debt then "began travel[]ing down the chain of legitimacy" until Weitlauf eventually was contacted by two pseudonymous debt collectors, both operating under "false consumer-facing name[s]": Management Associates and Allied Management.[7]  *Id.* at ¶¶ 57-58, 75.

Weitlauf now believes that Management Associates was defendant QRS because it used a "private UPS mailbox" that "was then, according to UPS, rented out for use by only one entity": QRS.  *Id.* at ¶¶ 59-60, 63.  Similarly, Weitlauf now believes that Allied Management was defendant SMA because Allied Management "employed a private UPS mailbox that was used by [SMA]."  *Id.* at ¶¶ 76-77.

---

[5] As further evidence of this alleged enterprise, Weitlauf "incorporates by reference" the allegations in the pleadings of seventeen other lawsuits in which several of the defendants here "made false and fraudulent representations and threats and thereby obtained payments" from debtors.  *Id.* at ¶ 124.

[6] "Payday loans are ostensibly short-term cash advances for people who face unexpected obligations or emergencies."  *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 117 (2d Cir. 2019).  "The loans are typically for small sums that are to be repaid quickly—in anywhere from several weeks to a year."  *Id.*

[7] Neither Management Associates nor Allied Management is named as a defendant here.  *See* Docket Item 18.

Weitlauf alleges two other links between Management Associates and the defendants.  First, Management Associates used "an email with the domain www.mgtassocs.com, which was registered by [] Richards."  *Id.* at ¶ 61.  Second, Management Associates "indicated that it would accept payment through a . . . payment processor known as SimplicityCollect," and "SimplicityCollect's sole point of contact for 'Management Associates' was [] Williams."  *Id.* at ¶ 62.

In or around July 2019, QRS—presumably as Management Associates—"called [Weitlauf's] daughter" and informed her of Weitlauf's debt.  *Id.* at ¶ 66.  After that phone call, Weitlauf and her daughter had a "conversation . . . that caused [Weitlauf] shame, embarrassment, and emotional distress."  *Id.* at ¶ 67.  Around the same time, QRS called Weitlauf and "threatened to serve her with papers" at her workplace.[8]  *Id.* at ¶ 68.  QRS then "offered to settle the entire balance of [Weitlauf's d]ebt for $500."  *Id.* at ¶ 71.  Weitlauf, who was "scared and [felt] bullied by QRS's threats, accepted this offer and paid . . . $500 to QRS in or [around] July of 2019."  *Id.* at ¶ 72.  She "would not have made this payment but for QRS's harassing and misleading conduct."  *Id.* at ¶ 73.

Weitlauf did not hear any more about the loan "for some months" after she made the $500 payment.  *Id.* at ¶ 74.  Then, in September 2020, SMA—presumably as Allied Management—"began to call" Weitlauf about the debt.  *Id.* at ¶ 75.  SMA told Weitlauf that as of September 25, 2020, "it had not received 'payment in full'" for her debt and that she was "'legally liable' for the amount of $1,501.01."  *Id.* at ¶ 81.  But "[t]hese

---

[8] Weitlauf now asserts that this threat "was false" because QRS lacked both the intent and the "capacity" to serve her in person.  Docket Item 18 at ¶ 69.

representation were false" because "[t]o the extent QRS had ever had a right to the [d]ebt, [Weitlauf had] settled the entire balance with QRS for $500." *Id.* at ¶¶ 82-83.

A short time later, SMA called Weitlauf's mother-in-law and "threatened to repossess a vehicle if the [d]ebt were not paid." *Id.* at ¶ 84. "This threat was false" because SMA had "no legal ability to repossess" the vehicle. *Id.* at ¶ 85. At that point, "[r]ather than pay the same debt a second time, [Weitlauf] retained counsel." *Id.* at ¶ 86.

Weitlauf alleges that QRS learned of her debt through bad paper "stolen from another collector or otherwise transferred illegally," ¶ 64, and that SMA learned about the debt via bad paper transferred from QRS, *id.* at ¶ 78. Neither entity had a "right to collect" the debt, however, which both entities "knew or should have known." *Id.* at ¶¶ 65, 79-80.

## PROCEDURAL BACKGROUND

On September 27, 2021, Weitlauf commenced this action on behalf of herself and as the representative of a class of

> [a]ll natural persons who have made or will make payments to [the d]efendants or any business entity under their ownership or control, whether through a third-party payment processor or directly, as partial or total satisfaction or settlement of a debt, where the debt was not originally owed to [the d]efendants or any business entity under their ownership or control.

Docket Item 1 at ¶ 86, *see* Docket Item 18 at 88. On February 8, 2022, Hopkins, GLHE, GPG, PAMG, QRS, and CTC jointly moved to dismiss the complaint. Docket Item 9. The next day, SSM moved to join the motion to dismiss. Docket Item 11. Rather than

respond to the motion, Weitlauf filed an amended complaint.[9]  Docket Item 18.  On

March 30, 2022, those same defendants, now including SSM (collectively, the "moving

defendants"), moved to dismiss the amended complaint.[10]  Docket Item 23.  On April

13, 2022, Weitlauf responded, Docket Item 24, and on April 20, 2022, the moving

defendants replied, Docket Item 25.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Although the

statute of limitations is ordinarily an affirmative defense that must be raised in the

answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the

defense appears on the face of the complaint."  *Conn. Gen. Life Ins. Co. v. BioHealth*

*Labs., Inc.*, 988 F.3d 127, 131-32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d

492, 501 (2d Cir. 2015)).

---

[9] In light of the amended complaint and the second motion to dismiss, the first
motion to dismiss, Docket Item 9, is denied as moot.

[10] The other defendants—Richards, Williams, RJRO, 4CIS, SMA, and ARG—
have not yet appeared in this action.

**DISCUSSION**

I.   **MOTION TO DISMISS**

   A.   **FDCPA Claims**

   Weitlauf alleges that the defendants violated various provisions of the FDCPA.

Docket Item 18 at ¶¶ 101-10.  The moving defendants argue that some of Weitlauf's

FDCPA claims are time barred and that none are meritorious.  Docket Item 23-1 at 24-

28.  Weitlauf concedes that some of her FDCPA claims are time barred, disputes the

untimeliness of others, and argues that she has stated an FDPCA claim.  Docket Item

24 at 13-14.

   1.   **Timeliness**

   A plaintiff alleging a violation of the FDCPA must file suit "within one year from

the date on which the violation occurs."  15 U.S.C. § 1692k(d).  Weitlauf commenced

this action on September 27, 2021.  Docket Item 1.  Therefore, the moving defendants

argue, her FDCPA claims related to violations that occurred before September 27,

2020, are time barred.  Docket Item 23-1 at 25-26.  More specifically, they assert that

Weitlauf's FDCPA claims arising from the following interactions are untimely: (1)

Management Associates' July 2019 call to Weitlauf's daughter; (2) Management

Associates' July 2019 call to Weitlauf; and (3) Allied Management's communication to

Weitlauf that her debt was still owed as of September 25, 2020.[11]  *Id.*

---

[11] The defendants misstate the September 2020 date as "September 25, 2021."
Docket Item 23-1 at 25.  This Court assumes that is a typographical error.

Although the amended complaint does not allege the exact date of the Allied
Management communication, the defendants "infer that [Weitlauf's] communication with

Weitlauf concedes that her FDCPA claims related to the July 2019 communications are time barred.  Docket Item 24 at 14.  But she says that her claims related to the September 25, 2020 communication from Allied Management are not time barred because September 25, 2021, was a Saturday and she commenced this action on Monday, September 27, 2021, the following business day.[12]  *Id.* at 13.

Weitlauf is correct: because September 25, 2021, was a Saturday, the statute of limitations for the claims related to the September 25, 2020 communication ran until September 27, 2021.  *See* Fed. R. Civ. P. 6(a)(1) ("When the [limitations] period is stated in days[,] . . . if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next [business day].").

Weitlauf's FDCPA claim related to the September 2020 communication allegedly from SMA as Allied Management therefore is timely.  But her FDCPA claims related to the July 2019 communications allegedly from QRS as Management Associates are dismissed because they are time barred.

### 2.    Failure to State a Claim

"To state a claim under the FDCPA, a plaintiff must show that (1) she has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or

---

Allied Management[] occurred on September 25, 202[0]."  Docket Item 23-1 at 25.  This Court draws the same inference.

[12] Weitlauf also argues that her FDCPA claims related to the Allied Management communications are not time barred because "her mother-in-law received an additional, violative call a short but undetermined period of time after September 25, 2020." Docket Item 24 at 13.

omission prohibited by the FDCPA." *Kurzdorfer v. Constar Fin. Servs., LLC*, 490 F. Supp. 3d 663, 666 (W.D.N.Y. 2020).

The amended complaint alleges that SMA—as Allied Management—violated the FDCPA by contacting Weitlauf's mother-in-law; calling Weitlauf "without meaningfully disclosing its identity"; falsely representing that Weitlauf owed her debt after she had settled it; using a name other than its "true business name[]"; seeking to "collect a debt to which [it] had no legal right"; and falsely threatening to "repossess a vehicle when [it] had no right or intention to do so." Docket Item 18 at ¶ 105. The moving defendants argue that Weitlauf has failed to state an FDCPA claim against them because she has not alleged that they were Allied Management—the entity that attempted to collect Weitlauf's debt. Docket Item 23-1 at 26-28 (capitalization omitted).

Weitlauf alleges that Allied Management is a pseudonym for SMA; she bases that allegation on the fact that the two businesses used the same "private UPS mailbox."[13] Docket Item 18 at ¶¶ 76-77. But she alleges no facts directly linking Allied Management to any other defendant, including the moving defendants. *See* Docket Item 18. Rather, she advances two theories of liability to reach the other defendants: alter ego liability and conspiracy liability. But neither theory carries the day.

### a.    Alter Ego Liability

"[T]he jurisprudence on whether affiliated entities can be liable for FDCPA claims under an alter ego theory is not well developed." *Weiss v. Sherloq Revenue Sols., Inc.*, 2021 WL 965810, at *5 (S.D.N.Y. Mar. 12, 2021) (citation omitted). Nevertheless, courts have borrowed a few guiding principles of alter ego liability from other contexts.

---

[13] SMA is not a moving defendant. *See* Docket Item 23.

For example, a plaintiff asserting FDCPA liability on an alter ego theory must plead "more than conclusory allegations of control; the party seeking to establish alter ego liability must plead sufficient factual allegations to establish that the related entity's domination of the alleged alter ego was the means by which a wrong was done to [the] plaintiff." *Id.* (alterations and citation omitted).  Factors courts consider when evaluating whether an entity is an alter ego include "(1) the sharing of a common office, staff, and ownership; (2) the intermingling of funds; (3) the treatment of the corporations as one, not separate, profit centers; (4) the lack of the conventions of corporate existence; and (5) any inadequate earnings." *Id.* (citation omitted).

Under her alter ego theory of liability, Weitlauf alleges that (1) the individual defendants are liable for SMA's actions "because they jointly own, manage, and oversee . . . SMA"; (2) the holding company defendants are liable "because each is an alter ego of one of the [i]ndividual [d]efendants"; (3) the collection entity defendants are liable "because each is an alter ego of every other [c]ollection [e]ntity [d]efendant, including . . . SMA"; and (4) CTC is liable "because it is an alter ego of [] Hopkins." Docket Item 18 at ¶¶ 106-08.  To support that theory, Weitlauf identifies links between and among various defendants: shared addresses, a shared workers' compensation plan, Williams's guilty plea implying a connection with Hopkins and RJRO, and multiple defendants' positions as officers of SSM.

Those connections may create a plausible inference that the defendants have relationships with one another. *See infra* at 21-24.  But Weitlauf's allegations that the defendants are alter egos of each other is wholly conclusory.  For example, she provides no factual basis for her allegations that the defendants comingle funds, have

no separate existence from one other, and disregard corporate formalities.  *See* Docket Item 18 at ¶¶ 8-9, 106-08.  Indeed, those allegations are mere speculation.  *See id.* at ¶ 11 (1) ("Given the secretive nature of the various entities, the illegality fundamental to their business model, and the fraudulent payments between the individual [d]efendants . . . , there is no reason to believe that these entities observe corporate formalities or even that they operate as separate businesses at all.").

Weitlauf therefore has failed to plausibly allege that the moving defendants may be held liable for violating the FDCPA under an alter ego theory.

> ### b.    *Conspiracy Liability*

"While the FDCPA is a strict liability statute that demands no proof of a defendant's state of mind, a civil conspiracy claim requires the plaintiff to show that each conspirator intentionally joined the venture with knowledge of its unlawful purpose."  *LaCourte v. JP Morgan Chase & Co.*, 2013 WL 4830935, at *11 (E.D.N.Y. Sept. 4, 2013) (internal citations omitted).

As an alternative to her alter ego theory of liability, Weitlauf alleges that "all defendants are liable for the actions of . . . SMA because all conspired together with the intent to violate the FDCPA for mutual financial gain."  Docket Item 18 at ¶ 110.  But she alleges no facts that give rise to a plausible inference of that intent.  *See* Docket Item 18.  Instead, her conspiracy liability theory rests on the same conclusory allegations that are insufficient to sustain her alter ego theory.

Weitlauf therefore has failed to plausibly allege that the moving defendants may be held liable on a conspiracy theory.  Because both of Weitlauf's theories of FDCPA

liability fail, she has failed to state an FDCPA claim against the moving defendants[14]

and those claims are subject to dismissal.[15]

### B.    RICO Claims

Under RICO, it is unlawful "for any person employed by or associated with any

enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful

debt."  18 U.S.C. § 1962(c).  Weitlauf asserts both a substantive RICO claim, Docket

Item 18 at ¶¶ 111-27, and a RICO conspiracy claim, *id.* at ¶¶ 128-33.

"Courts have described civil RICO as 'an unusually potent weapon—the litigation

equivalent of a thermonuclear device.'"  *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp.

3d 289, 297 (E.D.N.Y. 2017) (quoting *Katzman v. Victoria's Secret Catalogue*, 167

F.R.D. 649, 655 (S.D.N.Y. 1996)).  But while "civil RICO may be a 'potent weapon,'

plaintiffs wielding RICO almost always miss the mark."  *Id.* (citing *Gross v. Waywell*, 628

F. Supp. 2d 475, 479-83 (S.D.N.Y. 2009) (surveying a set of civil RICO cases from 2004

to 2007 and finding that all 36 cases resolved on the merits resulted in judgments

---

[14] While Weitlauf may have alleged facts sufficient to state FDCPA claims against one moving defendant—QRS—those claims are untimely as noted above.  *See supra* at 14-15.

[15] Because Weitlauf's FDCPA claims against the moving defendants are subject to dismissal on the ground that Weitlauf has not plausibly alleged that they were responsible for SMA's collection activity, this Court does not reach the arguments that some of the moving defendants are not debt collectors and thus not subject to the FDCPA, *see* Docket Item 23-1 at 26-30, and that Weitlauf's FDCPA claims related to the Allied Management communications fail because Weitlauf has not "allege[d] any injury as a result of [that] collection activity," Docket Item 25 at 2 n.1.  Nor does it address whether Weitlauf has stated an FDCPA claim against the non-moving defendants, including SMA.

against the plaintiffs)).  The moving defendants assert that Weitlauf likewise misses the

mark.  Docket Item 23-1 at 11-13.  For the following reasons, this Court agrees.

### 1.    Failure to State a Substantive RICO Claim

A substantive civil RICO claim "contains three principal elements: (1) a violation

of 18 U.S.C. § 1962; (2) injury to [the] plaintiff's business or property; and (3) causation

of the injury by the violation."  *Moss*, 258 F. Supp. 3d at 297 (citation and internal

quotation marks omitted).  To establish a violation of 18 U.S.C. § 1962, "a plaintiff must

show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."

*DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (citations and internal quotation

marks omitted).

A RICO "'enterprise' includes any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity."  18 U.S.C. § 1961(4).  "[A]n association-in-fact enterprise is

a 'group of persons associated together for a common purpose of engaging in a course

of conduct.'"  *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v.

Turkette*, 452 U.S. 576, 583 (1981)).  "[A]n association-in-fact enterprise must have at

least three structural features: [1] a purpose, [2] relationships among those associated

with the enterprise, and [3] longevity sufficient to permit these associates to pursue the

enterprise's purpose."  *Id.*

Weitlauf alleges that the defendants "form an association-in-fact."  Docket Item

18 at ¶ 114.  The moving defendants argue Weitlauf has not plausibly alleged that the

defendants are related in pursuit of a common purpose.[16]  Docket Item 23-1 at 22-24.

This Court finds that while Weitlauf has plausibly alleged that the defendants have

relationships with each other, she has not plausibly alleged that they share a purpose.

>                   a.      *Relationships Among Defendants*

"Relationships among those associated with the enterprise are essential

structural features of a RICO association-in-fact."  *Black v. Ganieva*, 2022 WL 2374514,

at *16 (S.D.N.Y. June 30, 2022) (citing *Boyle*, 556 U.S. at 946) (alteration and internal

quotation marks omitted).

> "In evaluating whether a complaint pleads the required association, courts
> examine factors including (i) whether members of the alleged enterprise
> have interpersonal relationships; (ii) where the members are located, and
> whether the complaint explains how they came to an agreement to act
> together or how they knew one another; (iii) whether the members are
> symbiotic—in other words, whether they depend on one another, act to
> benefit one another, or rely on one [an]other's activities; and (iv) whether
> the alleged predicate acts could be accomplished without the assistance of
> the other members of the alleged enterprise."

*Id.* (quoting *Dynarex Corp. v. Farrah*, 2019 WL 2269838, at *3 (S.D.N.Y. May 28,

2019)).

"[V]ague claims" and "insinuations of a relationship" between alleged members of

an enterprise, "unbolstered by specific factual allegations, are insufficient to plausibly

allege a relationship."  *Id.* at *16-17.  Rather, a plaintiff must plead "concrete facts," *id.* at

*17, that create a reasonable inference that the defendants were "an 'ongoing

organization' as opposed to an *ad hoc* collection of entities and individuals who each

happened to have been involved in one scheme or another," *Cedar Swamp Holdings,*

---

[16] The moving defendants do not explicitly argue that Weitlauf has not satisfied
the longevity prong of the association-in-fact test.  *See* Docket Item 23-1.

*Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007).  *See also Elsevier Inc. v.*

*W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) ("Nothing in the [c]omplaint

explains how these particular people, located in different parts of the country, came to

an agreement to act together—or even how they knew each other.  Indeed, the

[c]omplaint does not even allege *that* they [knew] each other." (emphasis in original));

*Moss*, 258 F. Supp. 3d at 301 (finding that the plaintiff's "conclusory" allegations that the

defendants "preserve close business relationships and maintain established and

defined roles within the enterprise" were "insufficient to state a RICO claim").

Here, the moving defendants argue that the amended complaint "fails to suggest

that a relationship exists between [the m]oving defendants and the other[]" defendants.

Docket Item 23-1 at 23.  But they are too quick to dismiss the links that Weitlauf

identifies.

Weitlauf alleges several facts connecting the defendants to one another.  For

example, she alleges that Williams pleaded guilty to a charge of fraud connected to a

scheme in which he "attempted to distribute" illicitly obtained funds to himself, Hopkins,

and RJRO.  Docket Item 18 at ¶ 7.  She alleges that Hopkins, Richards, GLHE, and

RJRO are officers of SSM.  *Id.* at ¶ 11.  She alleges that SSM and QRS have shared a

workers' compensation insurance plan.  *Id.* at ¶¶ 11, 13.  The moving defendants do not

address those allegations—let alone explain why they do not establish a relationship

between or among at least some defendants.  *See* Docket Item 23-1 at 22-24.

To make their argument, the moving defendants reduce the alleged links

between and among the defendants to "two threads" that they say suggest only a

"tenuous connection": Weitlauf's allegations that some defendants share the addresses

22

620 Park and 40 Humboldt.  *Id.* at 23-24.  But that tack is unavailing.  To start, the

moving defendants' description of the shared addresses alleged in the amended

complaint is incomplete: in addition to alleging that some defendants share 620 Park

and 40 Humboldt, Weitlauf alleges that various defendants also share 135 Holyoke,

P.O. Box 21326, and P.O. Box 246.[17]  Docket Item 18 at ¶¶ 5, 8-16.  It is true that

Weitlauf does not allege that each defendant is directly connected to each shared

address.  But she does allege that each business entity defendant is connected to at

least one shared address and that, through their ownership or management of the

business entity defendants, no individual defendant is more than two degrees of

separation from at least one shared address.

Viewed as a whole, the amended complaint's factual allegations draw a complex

connection of relationships between and among the defendants.  And unlike the

conclusory allegations that many courts have found insufficient to sustain a civil RICO

claim, Weitlauf's allegations are specific and factual, giving rise to a plausible inference

that the defendants are related to one another.  *Cf. Black*, 2022 WL 2374514, at *16

("[The amended complaint] papers over the absence of concretely pled facts indicative

of a relationship between the supposed enterprise's central figure and her two

supposed lead backers through the use of vague claims to the effect that the three

made 'common cause' in an 'unholy alliance.'"); *Dynarex*, 2019 WL 2269838, at *3

(allegations that the defendants "knew one another from various professional contexts"

were conclusory and did not suggest that the defendants "were even aware of each

---

[17] In their reply, the defendants acknowledge Weitlauf's allegation that multiple
defendants use P.O. Box 246.  Docket Item 25 at 5.

other's existence").  Weitlauf therefore has plausibly alleged the relationship prong of an association-in-fact.

> b.   Purpose

"[F]or an association . . . to constitute an enterprise, [its members] must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004).  "Conclusory allegations that disparate parties were associated in fact by virtue of their involvement in [a particular] industry" do not establish that those parties shared a common purpose.  *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993).  Rather, a plaintiff must plead facts giving rise to a plausible inference that the defendants "acted on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities, to advance their individual self-interests."  *D. Penguin Brothers Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (summary order) (alteration and emphasis in original).  Absent "further factual enhancement," *id.* (quoting *Iqbal*, 556 U.S. at 678), allegations that defendants "each committed a similar but independent fraud" do not establish a common purpose, *First Nationwide*, 820 F. Supp. at 98.

The moving defendants argue that Weitlauf has not plausibly alleged that they are united by a common purpose because her allegations about how the defendants operate are "nothing more than [] 'naked assertion[s]' without 'further factual enhancement.'"  Docket Item 23-1 at 22 (citing *Iqbal*, 556 U.S. at 678; Fed. R. Civ. P. 9(b)).  This Court agrees.

Weitlauf alleges that the defendants formed an enterprise with the purpose of "collect[ing] debts that are not legally owed" to them by "extort[ing] payment from

[debtors] by means of fraudulent and deceitful representations." Docket Item 18 at ¶ 115. She alleges that either Hopkins purchases bad paper "and distributes spreadsheets of debtor information to the [e]nterprise's employees," *id.* at ¶ 118, or that Hopkins and Richards purchase bad paper and "distribute some [spreadsheets] to Williams and the rest among their own employees," *id.* at ¶ 119.

But the amended complaint does not allege facts plausibly supporting either of those theories. For example, other than vaguely alleging that the bad paper comes from other debt collectors, Weitlauf does not explain from where or whom the defendants obtain bad paper. *See, e.g.*, Docket Item 18 at ¶ 49. Nor does she offer any factual support for her contention that the defendants lack the legal right to collect the debt they pursue or that the defendants share spreadsheets of debtor information among themselves. *See* Docket Item 18. Finally, beyond the connections that establish a relationship between the defendants, Weitlauf provides no basis from which to infer that the defendants "acted on behalf of the *enterprise* as opposed to on behalf of [themselves]" when they attempted to collect debt, *see D. Penguin*, 587 F. App'x at 668 (alteration and emphasis in original), Docket Item 18; conclusory allegations that the defendants share spreadsheets of debtor information, without some factual basis, are insufficient.[18]

---

[18] In fact, the amended complaint suggests at one point that the individual defendants are pursuing only their own self-interests; Weitlauf alleges that Williams received her personal information from Hopkins and Richards "in exchange for funds that were intended to be received from the check fraud scheme resulting in Williams's recent conviction." Docket Item 18 at ¶ 46. That allegation suggests that the defendants do not share a common goal but rather use one another—in exchange for payment—to advance their own interests.

In other words, Weitlauf has made only conclusory allegations that the defendants are united by a common purpose.  Nothing in the amended complaint suggests that the defendants do not merely "commit[ ] similar but independent fraud[s]," *First Nationwide*, 820 F. Supp. at 98, to "advance their individual self-interests," *D. Penguin*, 587 F. App'x at 668.  And Weitlauf's conclusory allegations cannot defeat a motion to dismiss.  *See First Nationwide*, 820 F. Supp. at 98 (dismissing RICO claim for failure to allege a common purpose where "[p]laintiff merely assert[ed] that for over six years defendants shared common fraudulent purposes and plans").

Weitlauf's substantive RICO claim therefore is subject to dismissal because she has not plausibly alleged that the defendants share a common purpose.[19]

### 2.    Failure to State a RICO Conspiracy Claim

"To establish liability for a RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must show that each defendant 'embraced the objective of the alleged conspiracy and agreed to commit two predicate acts in furtherance thereof.'"  *Edmonds v. Seavey*, 2009 WL 2949757, at *7 (S.D.N.Y. Sept. 15, 2009) (quoting *United States v. Viola*, 35 F.3d 37, 43 (2d Cir. 1994)).  The moving defendants argue that Weitlauf's RICO conspiracy claim fails "because there is no plausible inference" from the amended complaint "of any agreement by the [m]oving [d]efendants to participate in the purported conspiracy."  Docket Item 23-1 at 24.  Weitlauf responds that she has plausibly alleged the requisite intent.  Docket Item 24 at 12-13.

---

[19] Because this Court finds that Weitlauf has not plausibly alleged that the defendants formed an enterprise and that her RICO claims therefore are subject to dismissal, it does not reach the question of whether Weitlauf has plausibly alleged that the defendants engaged in a pattern of racketeering activity.

But as discussed throughout this opinion, Weitlauf's allegations about the alleged enterprise's structure are conclusory.  For example, she speculates that the defendants had "a common plan" to defraud debtors, but she does not provide facts to support the existence of this shared plan.  *See id.* at 13 ("[I]t is highly implausible that the [i]ndividual [d]efendants have operated nearly a dozen business entities in the same line of unlawful business from the same locations . . . without a common plan to commit thousands of frauds.").  Likewise, she asserts that the defendants shared the goal of promoting the enterprise, but she does not offer anything that might make her assertion plausible.  *See generally* Docket Items 18 and 24.

Weitlauf therefore has not plausibly alleged that the moving defendants had the requisite state of mind for a RICO conspiracy claim, and her RICO conspiracy claims against the moving defendants are subject to dismissal.

### 3.    Civil RICO Case Statement

In the Western District of New York, a plaintiff asserting a RICO claim must "file and serve a 'RICO Case Statement.'"  L.R.Civ.P. 9.  "The RICO Case Statement must include those facts upon which the party is relying and which were obtained as a result of the reasonable inquiry required by [Federal Rule of Civil Procedure] 11."  *Id.*  Furthermore, the RICO Case Statement must comply with the form prescribed by the Local Rules.  *Id.*  "A party's failure to file a RICO Case Statement may result in dismissal of the party's RICO claim."  *Id.*

Weitlauf has not filed a RICO Case Statement.  Although this failure is procedural rather than substantive, it provides yet another basis to dismiss Weitlauf's RICO claims.

If Weitlauf amends her complaint again, she also must file a RICO Case Statement as directed by Local Rule 9.

### C.    State Law Claims

Weitlauf also asserts claims under New York State law, alleging that the defendants engaged in "deceptive acts and practices."  Docket Item 18 at ¶¶ 134-42; *see* N.Y. Gen. Bus. Law § 349.  The defendants argue that this Court should decline to exercise supplemental jurisdiction over Weitlauf's state law claims "in the event that [it] dismisses [Weitlauf's] FDCPA and RICO claims."  Docket Item 23-1 at 29-30.

This Court finds that Weitlauf's FDCPA and RICO claims against the moving defendants are subject to dismissal.  But it does not dismiss Weitlauf's federal claims against the other defendants—Richards, Williams, RJRO, 4CIS, SMA, and ARG— because those defendants have not yet appeared.  This Court therefore lacks the discretion to decline to exercise supplemental jurisdiction over the state law claims against the moving defendants.  *See Mejía v. Davis*, 2018 WL 333829, at *7 (S.D.N.Y. Jan. 8, 2018) ("The Second Circuit has made clear that a district court may not decline to exercise jurisdiction over state law claims where federal claims remain against other defendants and the state law claims form part of the same case or controversy (citations and internal quotation marks omitted)).  Moreover, this Court is giving Weitlauf permission to amend so that she might salvage her claims against even the moving defendants.

Because the moving defendants have offered no other reason for this Court to dismiss the state law claims against them, their motion to dismiss Weitlauf's state law claims is denied.

II.    **LEAVE TO AMEND**

Weitlauf has not requested leave to amend her complaint a second time.  She has implied, however, that she may possess information sufficient to overcome a motion to dismiss that was not included in her first amended complaint.  Docket Item 24 at 6 ("Plaintiff possesses other information regarding links among these entities, but she has elected not to plead those links in order to preserve them against need.  Given the secretive nature of [the d]efendants' unlawful enterprise, the [p]laintiff expects to need such knowledge in her pocket to demonstrate when [the d]efendants have not been forthcoming in discovery.").  Weitlauf therefore may amend her complaint a second time.

If Weitlauf again amends her complaint, her counsel is advised to present the strongest possible argument.  Litigation is not a game of "gotcha," and withholding potentially meritorious allegations is not a winning strategy.

As noted above, any amended complaint must be accompanied by a RICO Case Statement as required by Local Rule 9.

## CONCLUSION

For the reasons stated above, the moving defendants' first motion to dismiss, Docket Item 9, is DENIED as moot, and the moving defendants' second motion to dismiss, Docket Item 23, is GRANTED in part as noted above, is DENIED with respect to Weitlauf's state law claims, and will be granted with respect to all other claims against the moving defendants unless Weitlauf amends her complaint, within 30 days, to correct the deficiencies noted above.  No later than 30 days after any amended complaint is filed, the defendants may answer, move against, or otherwise respond to the amended

complaint.  If Weitlauf does not file an amended complaint within 30 days, her FDCPA

and RICO claims against the moving defendants will be dismissed as noted above.


SO ORDERED.

Dated:   March 17, 2023
             Buffalo, New York


_/s/ Lawrence J. Vilardo_
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE